ORTNER *v.* ZENITH CARBURETOR CO.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—CANCER—
FINDING OF INDUSTRIAL ACCIDENT BOARD—EVIDENCE—SUFFICIENCY.
On certiorari to review an award of compensation by the
industrial accident board to plaintiff for disability from
a cancer claimed to be caused by an injury to his hand
nearly three years before, while in defendant's employ, and
for which settlement had been made in full, where there is
no testimony amounting to legal evidence that the cancer,
which is in another part of his body, is attributable to
the injury to plaintiff's hand, the award will be set aside.

Certiorari to Industrial Accident Board. Submitted October 10, 1919. (Docket No. 27.) Decided December 22, 1919.

Paul Ortner presented his claim for compensation against the Zenith Carburetor Company for injuries received in defendant's employ. From an order awarding compensation, defendant and the Standard Accident Insurance Company, insurer, bring certiorari. Reversed, and order set aside.

*Keena, Lightner, Oxtoby & Hanley,* for appellants.
*Henry Wunsch* and *Edward F. Wunsch,* for appellee.

STEERE, J. For some time before October 16, 1915, plaintiff was employed by defendant Zenith Carburetor Company in Detroit, his work consisting mostly of grinding carburetors. His compensation was approximately $17.35 per week. On the morning of that date the third finger of his left hand was crushed in a drill at which he was working. It is undisputed that this injury arose out of and in the course of his employment. The carburetor company was operating under

On what constitutes an "accident" or "personal injury" within
the meaning of the workmen's compensation acts, see notes in
L. R. A. 1916A, 29, 227; L. R. A. 1917D, 103, and L. R. A.
1918F, 867.

the workmen's compensation law, carrying insurance with the defendant Standard Accident Insurance Company. Report was duly made of the accident to the State industrial accident board and proceedings had in accordance with statutory requirements and prescribed regulations of the board. An agreement was entered into between the parties for compensation, which was approved by the board and parties so notified. That adjustment, made with the approval of the board, was carried out by weekly payments, with medical and hospital attendance provided plaintiff until he resumed his employment. Blood poisoning, or infection of the wound, had resulted from the injury and he "complained of general soreness in different joints of his body" for some time. He returned to his former employment in April, 1916, and on the 28th of that month signed a final receipt "in settlement of compensation under the Michigan workmen's compensation law, for all injuries received by me on or about the 16th of October, 1915, while in the employ of the Zenith Carburetor Company." This receipt was filed with the industrial accident board as required by its practice, together with a final report of the accident.

At the time plaintiff returned to work he had, as described by the physician who attended him, "an anchylosed distal joint of the third left finger and a deformity of the distal of the fourth or little finger." This may have affected his skill or ability to perform certain work, but he was given employment by the carburetor company of a character somewhat similar to that in which he was employed before his injury at the same wages and remained in its employ for two years.

So far as shown by any records of the industrial accident board the rights of the parties in relation to that accident had been fully settled and adjudicated, payment made in full and final settlement receipt filed

with the board by May 3, 1916. Nothing further occurred and no further claim was made to the board in regard to the matter until October 14, 1918, when a petition was filed in plaintiff's behalf for the board to reopen his case. In due course of proceedings defendants answered and a hearing on said petition was set for November 19, 1918, at which time no one appeared in behalf of plaintiff and an order was entered by the board dismissing the petition.

On January 22, 1919, plaintiff filed a second petition asking for a rehearing, which defendants also answered. Following the practice in such cases the parties took whatever testimony of witnesses they desired and the same was returned to the board, followed by a hearing thereon. Upon such hearing, and against objection of defendants, the industrial accident board, on May 6, 1919, entered an order granting plaintiff's petition and required that defendants then pay plaintiff compensation at the rate of $6.61 per week, "as provided in the agreement approved December 3, 1915, from May 6, 1918, the date on which he stopped working for said respondent, to May 6, 1919, a period of 52 weeks, there being due and payable on the latter date the sum of three hundred and forty-three and 72-100 dollars ($343.72), and subsequent to May 6, 1919, that he be paid the same weekly compensation during the period of his total disability," etc.

No findings were made by the board beyond the statement in its order "that said applicant has been totally disabled as a result of the accidental personal injury he sustained on October 16, 1915, since May 6, 1918, when he stopped work for respondent, up to the present time."

Plaintiff's witnesses were himself and three physicians, Dr. Stockwell, who attended him during his disability after the accident of October, 1915, until he

resumed work; Dr. Webber, whom plaintiff consulted the latter part of May, 1918, and was treated by for some time, and Dr. Sigel, to whom plaintiff went after Dr. Webber said he could not do anything further for him and advised him to consult another physician.

It was shown by undisputed testimony of the physicians that plaintiff's physical disability after he stopped work in May, 1918, was due to a cancer which had recently developed in his private parts and rapidly progressed until at the time of hearing he was pronounced by them fatally afflicted.

The assignments of error contained in defendants' petition for writ of certiorari involve the following contentions:

"*First.* Under the law there was no jurisdiction in the industrial accident board to reopen this matter (which had been finally determined in May, 1916) upon applicant's petition filed in January, 1919.

"*Second.* Upon this record there is no evidence tending to support the order complained of in finding that the applicant's disability in 1918 was the result of accidental injuries received by him in the course of his employment by the Zenith Carburetor Company."

Of the second it is to be noted that all three of the physicians who professionally attended plaintiff and were called by him as witnesses agreed that cancer, with which he was afflicted during and after May, 1918, is a germ disease resulting from "streptococcus infection," which none of them claimed resulted from or had any direct connection with the injury to his hand in 1915. But Dr. Webber in answer to questions of plaintiff's counsel was favorable to the theory that plaintiff's reduced vitality and run down physical condition imputable to his accident in 1915 would, as he expressed it, "prevent him from having a cure to those parts down there and consequently the prolonged irritation would result in a cancerous infection," thereby purporting to trace a causal connection between the

injury to the hand in 1915 and what he describes as a "streptococcus infection underneath the foreskin" (in 1918), the development of which into a cancer "comes from irritation, continued irritation," and "especially where it is connected with the mucous membrane, grows fairly rapidly."

As to when he became afflicted with a cancer, plaintiff testified that the first time he had any trouble in his private parts was when he went to see Dr. Webber in May, 1918, which he subsequently modified by the statement that a sore first manifested itself there in November, 1917, and began to swell in February or March, 1918, paining him more or less since Christmas, and his condition became such that he had to quit work on May 4, 1918; but went back on the 14th or 15th and worked two days more when he could not stand it any longer and went to see Dr. Webber on May 18th, at which time he was in very bad physical condition. He then told the doctor that some one in the boarding house was playing a joke on him by placing something on the sheets in his bed which got upon his private parts, starting an irritation and swelling, and, as Dr. Webber states he understood it, "was not laid up or, that is, he did not have any trouble for any length of time."

Dr. Sigel, who first saw plaintiff January 2, 1919, testified that he was then emaciated and suffering from cancer or "carcinoma of the penis" which had developed very rapidly since that time; that he could not tell how long the disease was in progress for "a cancer cell may lie dormant sometimes for a year. It is simply a misplaced cell, and then some irritation causes it to grow very rapidly all of a sudden, which is very likely the case here."

Dr. Stockwell, who attended plaintiff following the accidental injury in 1915 until he resumed work, testified that he was sent to him for examination in Oc-

tober, 1918, and was at that time suffering with what the doctor diagnosed as a cancer which "showed it had existed for some little time from general appearances." Asked whether the cancer resulted from plaintiff's injury for which he had attended him he replied: "I would testify positively that the cancer was not caused by the injury."

Dr. Webber, from whose testimony alone it is claimed a causal connection is inferable, testified, in direct examination, as follows:

"I thought possibly it was a gonorrheal infection, but I found it was not; it was streptococcus infection. I treated him along for a short time with the usual remedies, the injections and the serum treatments, the vaccine treatments, and he did not seem to progress favorably; he was a little bit emaciated, and I thought he better consult somebody else.

"Q. How serious was that infection on the penis?

"A. Well, it was quite a serious one. The extension at that time was the full length practically of the penis.

"Q. What was the man's general condition of health, was he in a weakened, run-down condition of health?

"A. He was very emaciated.

"Q. Taking into consideration, Dr. Webber, that this man suffered an injury of the finger and the left hand which resulted in October, 1915, in a serious case of blood poisoning and general infection throughout the hand and the arm, for which he was treated by Dr. Stockwell in the hospital and in his office for a period of six months, and taking also into consideration that the man had had no other illness of any sort other than this blood poisoning between October, 1915, and the time you saw him in May, 1918, would you say that this slight infection of the penis was—or this infection of the penis was sufficient to run down that man's health to the point at which he was when you saw him?

"A. I would say that his emaciated condition was the result of possibly that infection that he had at that time. It prevented him from recuperating and

building up his general system, so that he was in a condition unfit for work. I would not say, though, that this infection of the penis was the result of his injury at that time, or that the extension of the inflammation of the penis at that time was the result of his injury; but I would say that his emaciated condition could result from his being run down and not having sufficient recuperative powers to build himself up. Consequently, this infection of the penis, as the result of his being run down, prevented him from possibly getting well.

"*Q.* Would you say that that emaciated condition could very logically follow a serious case of blood poisoning such as this man had?

"*A.* Why, certainly.

"*Q.* Some two years previous?

"*A.* Why, certainly.

"*Q.* Taking into consideration, doctor, that this man had no infection such as you have mentioned of the penis at the time of that blood poisoning, will you state whether or not it is your opinion very likely that this emaciated condition was the direct result of the blood poisoning?

"*A.* Why, certainly." * * *

On cross-examination he was asked and answered:

"*Q.* The first time you saw the applicant, Mr. Ortner, was in May, 1918?

"*A.* Yes, some time the latter part of May.

"*Q.* At that time he had quite a serious infection which extended the full length of the penis?

"*A.* Yes, sir. * * *

"*Q.* Did it occur to you that it was a cancer, doctor?

"*A.* Not at that time, no, sir.

"*Q.* It did not?

"*A.* No, sir; in fact, I don't think it was a cancer at that time.

"*Q.* When you informed him along in July that you could do nothing further for him and were trying to get rid of him, as it were, were you then of the opinion that it was a cancer?

"*A.* Well, I suspected there was something of that nature, I told Paul that the only thing that would help him anyway would be to have an operation. * * *

"*Q.* Assuming that this infection existed for six weeks or two months, was that not sufficient to reduce his vitality to the extent which you found it in May, 1918?

"*A.* No, I don't think so.

"*Q.* You don't think it was?

"*A.* No, sir.

"*Q.* You would not say it was not, though, doctor?

"*A.* Well, I would not swear. Yes, I would. I would say it would not reduce his vitality sufficiently.
* * *

"*Q.* But you are sure of one thing, are you, doctor, that this cancer did not result from that infection that he had some two and a half years ago?

"*A.* Oh, no.

"*Q.* It did not result from that?

"*A.* No, sir. I did not say it had anything to do with it.

"*Q.* But all you want us to understand is that perhaps when he went to see you in May, 1918, he was somewhat emaciated as the result of his injury some two years preceding that time?

"*A.* Yes, sir."

So far as Dr. Webber or the other physicians attempt to explain the nature and cause of cancer, admittedly the disease with which plaintiff was suffering in 1918 and by reason of which he became incapacitated and quit work in May, 1918, they show it to have been of local origin from a streptococcus or bacterial infection under the foreskin, roused to malignant activity and rapid growth by misplacement and "continued irritation," none of which is given any causative relation or imputed to the healed industrial injury to his hand, two and a half years before. Whether such a disease germ so planted and roused to malignant growth by misplacement and constant irritation is in its nature recognized by the medical profession as best developed or best resisted by otherwise healthy condition or superior vitality we are not advised beyond Dr. Webber's pathologic theory that

plaintiff's "little bit" and "very" emaciated condition *could* have resulted from his recuperative powers having been impaired as the result of the former injury to his hand, which *possibly* prevented him from "getting well" of the subsequent cancer; although asserting he "did not say" the infection of his hand two and a half years before "had anything to do with it." There is no evidence, or even theory, that the infecting germ, from which the cancer causing plaintiff's subsequent incapacity resulted, found lodgment where it developed by reason of or in the course of his employment, nor that the irritation which his physicians name as an essential element to its growth was attributable to his former injury or employment.

This record affords no testimony to facts or theory amounting to legal evidence that the cancer by which plaintiff was incapacitated in 1918 is attributable to the accident to his hand in 1915.

The award is therefore set aside.

BIRD, C. J., and SHARPE, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.